IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF CHARITY N. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CHARITY N. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

DENNIS S., APPELLANT, AND MARY K. AND CURTIS N., APPELLEES AND CROSS-APPELLANTS.

Filed July 5, 2016.    No. A-15-908.

Appeal from the Separate Juvenile Court of Douglas County: PATRICIA A. LAMBERTY, District Judge, Retired. Affirmed.

Kevin A. Ryan for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony M. Hernandez, and Jennifer Chrystal-Clark for appellee State of Nebraska.

Sandra E. Stern for appellee Mary K.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellee Curtis N.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Dennis S. appeals, and Mary K. and Curtis N. cross-appeal, from an order of the separate juvenile court for Douglas County terminating their parental rights to their minor children. Based on the reasons that follow, we affirm.

## II. BACKGROUND

Mary is the biological mother of Charity N., Maximilian K. (Max), and Donovan K. Curtis is the biological father of Charity, and Dennis is the biological father of Max and Donovan.

On May 23, 2013, the State filed a petition alleging that Charity and Max came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) and lacked proper care by reason of the faults or habits of Mary and Dennis in that: Charity disclosed she was exposed to inappropriate sexual contact by a family friend on May 22, 2013; that Mary and Dennis failed to protect Charity from inappropriate sexual contact; Mary and Dennis' use of alcohol and/or controlled substances placed Charity and Max at risk for harm; Mary and Dennis failed to provide the children with safe, stable and appropriate housing; Mary and Dennis failed to provide proper parental care, support and supervision for the children; and that the above allegations put the children at risk for harm. The State also filed a motion for immediate custody of Charity and Max, which the juvenile court granted. On May 29, the juvenile court adjudicated Charity and Max, finding them to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a).

On March 4, 2014, the State filed a supplemental petition alleging that Charity came within the meaning of § 43-247(3)(a) and lacked proper care by reason of the faults or habits of Curtis. On September 4, the State filed an amended supplemental petition alleging that Charity came within the meaning of § 43-247(3)(a), and was homeless or destitute, or without proper support through no fault of Curtis, in that: Curtis was residing in a nursing home, due to an accident at work, which left him with a severe brain injury; he is unable to provide Charity with safe, stable, and appropriate housing; Curtis is unable to provide proper parental care, support and supervision for Charity; and due to the above allegations, Charity is at risk for harm. On September 10, the juvenile court found Charity to be within the meaning of § 43-247(3)(a) in regard to Curtis.

On September 11, 2014, the State filed a second supplemental petition, alleging that Donovan came within the meaning of § 43-247(3)(a) and lacked proper care by reason of the faults or habits of Mary in that: Mary's use of alcohol and/or controlled substances placed Donovan at risk for harm; Mary has left Donovan with an inappropriate care giver; Mary has failed to provide him with proper parental care, support and supervision; and the above allegations made Donovan at risk for harm.

On December 1, the State filed an amended second supplemental petition alleging that Donovan came within the meaning of § 43-247(3)(a) for the same reasons stated in the September 11 second supplemental petition, and further alleging that grounds to terminate Mary's parental rights to Donovan existed under Neb. Rev. Stat. § 43-292(2) and that terminating Mary's rights would be in Donovan's best interests. On February 20, 2015, the State filed a second amended second supplemental petition which added § 43-292(5) as a ground for termination of Mary's parental rights to Donovan.

On December 1, 2014, the State filed a motion for termination of Mary's parental rights to Charity and Max, alleging that they came within the meaning of § 43-292(2), (5), (6), and (7), and that termination was in their best interests.

The State also filed a second motion for termination of parental rights alleging that grounds existed to terminate Curtis' parental rights to Charity based on § 43-292(1), (2), (7), and (9), and that termination was in Charity's best interests.

Also on December 1, 2014, the State filed a third supplemental petition alleging Donovan came within the meaning of § 43-247(3)(a) and lacked proper care by reason of the faults and habits of Dennis in that: Dennis' use of alcohol and/or controlled substances placed him at risk for harm; Dennis had left Donovan with an inappropriate care giver; Dennis had failed to provide Donovan with proper parental care, support and supervision; and that based on the above allegations, Donovan was at risk for harm. The third supplemental petition further alleged that grounds existed to terminate Dennis' parental rights to Donovan based on § 43-292(2) and that terminating his rights was in Donovan's best interests.

That same day, the State also filed a third motion for termination of Dennis' parental rights to Max, alleging that grounds to terminate existed under § 43-292(2), (6), and (7), and that termination would be in Max's best interests. The State also filed a motion to terminate Curtis' parental rights to Charity, alleging that Charity was within the meaning of § 43-292(1), (2), (7), and (9), and that termination was in Charity's best interests.

A hearing was held in August 2015 regarding the petitions to adjudicate Donovan in regard to Mary and Dennis and the motions for termination of parental rights as to all three parents and their respective children. Following the hearing, the juvenile court entered an order finding Donovan to be within the meaning of § 43-247(3)(a) in regard to Mary and Dennis. The court further found Charity and Max to be within the meaning of § 43-292(2), (5), (6), and (7) and that termination of Mary's rights was in their best interests. The court found Donovan to be within the meaning of § 43-292(2) and (5) and that termination of Mary's parental rights was in his best interests.

In regard to Dennis, the juvenile court found Donovan to be within the meaning of § 43-292(2); Max to be within the meaning of § 43-292(2), (6), and (7); and that termination of Dennis' parental rights was in Donovan and Max's best interests.

The juvenile court also found Charity to be within the meaning of § 43-292(1), (2), (7), and (9) insofar as Curtis is concerned and that terminating Curtis' rights was in Charity's best interests.

Mary, Dennis and Curtis each appeal the termination of their respective parental rights. Due to the large record and the complexity of the facts of this case due to appeals by three parents and the various statutory grounds for termination, we do not set forth the specifics of the testimony and exhibits here. Rather, we will set forth specific facts as presented at the hearing as necessary in our analysis below.

### III. ASSIGNMENTS OF ERROR

On appeal, Dennis assigns that the court erred in (1) finding that Max was within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7), and that Donovan was within the meaning of § 43-292(2); and (2) finding that it was in Max and Donovan's best interests that his parental rights be terminated.

On cross-appeal, Mary assigns that the court erred in (1) finding there was clear and convincing evidence to support the termination of her parental rights to Charity and Max, and

(2) finding there was clear and convincing evidence to support the termination of her parental rights to Donovan.

On cross-appeal, restated, Curtis assigns that the juvenile court erred in (1) finding that Charity was within the meaning of § 43-292(1), (2), (7), and (9); and (2) finding that it was in Charity's best interests that his parental rights be terminated.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Zanaya W.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

## V. ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests. See *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id.*

### 1. MARY'S PARENTAL RIGHTS TO CHARITY, MAX, AND DONOVAN

We first note that Mary only makes general assignments of error that the court erred in finding there was clear and convincing evidence to support the termination of her parental rights to Charity, Max, and Donovan. She fails to specifically assign that the juvenile court erred in finding certain statutory grounds were proven to terminate her parental rights or that the court erred in finding it was in the children's best interests to terminate her rights.

### (a) Statutory Basis for Termination as to Charity and Max

As stated above, termination of parental rights is warranted whenever one or more of the statutory grounds provided in § 43-292 is established. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Jagger L., supra.*

The State alleged, and the juvenile court found, that termination of Mary's parental rights to Charity and Max was warranted pursuant to § 43-292(2), (5), (6), and (7). Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Aaron D., supra.*

At the hearing, the evidence showed that Charity and Max were removed from Mary's home on May 23, 2013 and have not returned home since that time. The State filed its motion to terminate Mary's parental rights on December 1, 2014, approximately 18 months after the children were removed. An additional 8 months passed from the time the motion was filed to the time the termination hearing concluded in August 2015. In sum, the children had been in an out-of-home placement for 26 months at the time the termination hearing concluded. As such, there is no dispute that Charity and Max were in an out-of-home placement for 15 or more months of the most recent 22 months as § 43-292(7) requires.

Accordingly, there is clear and convincing evidence that termination of Mary's parental rights in regard to Charity and Max was warranted based on § 43-292(7). And, because § 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights, we need not specifically address whether the State also met its burden under § 43-292(2), (5), or (6).

(b) Statutory Basis for Termination as to Donovan

In regard to Mary's parental rights to Donovan, the juvenile court found that grounds existed to terminate her rights pursuant to § 43-292(2) and (5). Subsection (2) requires a showing that sufficient evidence exists that the parent has substantially and continuously or repeatedly neglected and refused to give the minor child necessary parental care and protection.

Donovan was born in April 2014 and he was not immediately removed from Mary's care. Mary was provided with services in the hopes of keeping Donovan in the home. The services included intensive family preservation (IFP) and a safety plan, both of which were to ensure Donovan's safety in Mary's home. As part of the safety plan, Donovan was not to be left alone with anyone but Mary and certain individuals approved by the IFP team. Megan Yost, the case manager at the time, testified that Mary successfully completed the IFP program. However, once Mary completed the program, Yost started losing contact with her and her compliance with the case plan diminished. Yost testified that since she could not reach Mary by telephone, she decided to stop by Mary's house. The first time she did, Mary was not home and she had left Donovan in the care of an unapproved individual, which was a violation of the safety plan. A background check revealed the individual had a significant history of drug use. Yost also testified that Mary stopped complying with urinalysis (UA) requests and was not attending all of the family team meetings. She was discharged from UA testing in July 2014 for noncompliance. Yost set up UA testing for her again and she was discharged a second time in February 2015. Yost testified she was concerned that Donovan was at risk for harm because given her lack of contact with Mary she was unable to determine how he was doing in the home.

Donovan was removed from Mary's home on September 11, 2014, based on an affidavit filed by Yost recommending removal. After he was removed, Mary stopped participating in all services.

We conclude that there is clear and convincing evidence to show that Mary has substantially and continuously or repeatedly neglected and refused to give the minor child necessary parental care and protection. She was given the opportunity to keep Donovan in the home and the State provided her with services to do so. Although she completed the IFP program,

after doing so her compliance with services diminished and she violated the safety plan. After Donovan was removed from her home, she completely stopped participating in any services. Her actions demonstrate that she is unwilling to do what is necessary to care for and protect Donovan.

Because we conclude that termination of Mary's parental rights to Donovan was warranted based on § 43-292(2), we need not specifically address whether the State also met its burden under § 43-292(5).

(c) Best Interests of Charity, Max, and Donovan

We next consider whether there is sufficient evidence to prove by clear and convincing evidence that it is in Charity's, Max's, and Donovan's best interests that Mary's parental rights be terminated. Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

Charity has been removed from the home on three separate occasions, and Max has been removed twice. Charity was first removed in April 2006 due to Mary's mental health and methamphetamine dependency. She was returned home in January 2008. Charity and Max were removed from Mary's home in January 2009 due to Mary's methamphetamine use and neglect of the children. Charity and Max were returned home at the end of June 2011. Charity and Max were removed a third and second time respectively, in May 2013, when the present case was filed, again due in part to Mary's methamphetamine use. At the time of trial, Charity was 12 years' old and had been in foster care for over 5 years of her life. Max was 8 years' old and had spent 57 months in foster care. Donovan was under 2 years' old and had been in foster care for 11 months. Yost testified that the reasons Charity and Max were out of the home were the same reasons they were removed the times before--Mary's drug use and domestic abuse in the home.

The evidence showed a history of domestic abuse between Mary and Curtis, and Mary and Dennis. Some of the abuse by Dennis occurred in the presence of the children. Charity testified about seeing Mary and Dennis have physical altercations and that she and Max were scared when they would fight. She also testified that she and Mary would sometimes leave during the fights and they would stay overnight with a friend or sleep in the car. Dennis would not let Max leave with them.

Mary has a history of methamphetamine dependence and also has a history of mental illness, specifically bipolar disorder. She is under a Board of Mental Health Commitment for life due to her bipolar disorder, requiring her to be under the care of a psychiatrist. Mary testified that her medication makes her sleep a lot.

At the time of trial, Mary did not have appropriate housing for the children. She had a mental breakdown after Donovan was removed in September 2014 and lost her housing as a result of it. Mary was living with her nephew and she told Yost that her nephew's home was not a place she would want the children living.

Charity testified that she does not want to live with Mary because Mary will not take care of her. She stated that Mary sleeps a lot and will not take her to school or feed her, nor will she keep her safe. There was also evidence that a friend of Mary's sexually assaulted Charity in May 2013. The friend was staying at Mary's home and after Charity reported it to Mary, Mary allowed

- 6 -

the friend to stay overnight and did not tell him to leave until the next day. She did not call the police.

Yost determined that it was in the children's best interests to terminate Mary's parental rights based on her history of drug use, history of domestic violence, history of mental health issues, history of inconsistency with services such as visits, UA testing, and therapy, her noncompliance with meetings with Yost, the state of her home, the number of times the children have been removed from her care, and Mary's noncompliance with court orders.

Elizabeth Beltz, Charity and Max's therapist, testified that stability is important for all children, but even more so for Charity and Max given that they have been removed from their home more than once. She stated that the uncertainty of what will happen next scares them and causes anxiety. Beltz opined that Mary's parental rights to Charity and Max should be terminated because they do not feel safe in Mary's care and they need a stable and consistent environment.

Mary has been given ample time to rehabilitate herself and has been offered numerous services, yet she is still not ready to parent her children. Yost testified that Mary was compliant with the case plan and the services being offered to her for the first year after this case was filed. The second year, however, Mary's compliance was inconsistent. Yost testified that there were periods of time where she would do everything asked of her and other periods where she was not participating in services and would consequently get discharged. After Donovan was removed in September 2014, Mary stopped complying with the case plan and services offered by the State.

Jolynn Schwisow, the children's foster parent, testified that a month before trial, Mary admitted to her that she cannot take care of her children at this time.

When a parent is unwilling or unable to rehabilitate herself within a reasonable period of time, the best interests of the child require termination of parental rights. *In re Interest of B.B.*, 239 Neb. 952, 479 N.W.2d 787 (1992). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Sunshine A.*, 258 Neb. 148, 602 N.W.2d 452 (1999). We conclude that there was clear and convincing evidence that terminating Mary's parental rights was in Charity's, Max's, and Donovan's best interests.

2. DENNIS' PARENTAL RIGHTS TO MAX AND DONOVAN

(a) Statutory Basis for Termination as to Max

The State alleged, and the juvenile court found, that termination of Dennis' parental rights to Max was warranted pursuant to § 43-292(2), (6), and (7). Because we find that the evidence clearly and convincingly demonstrates that Max was in an out-of-home placement for at least 15 of the most recent 22 months, pursuant to § 43-292(7), we need not specifically address whether the State also met its burden under § 43-292(2) or (6).

There was uncontradicted evidence which demonstrated that approximately 18 months passed from the time Max was removed from Mary and Dennis' home on May 23, 2013, and the time that the State filed its motion to terminate Dennis' parental rights on December 1, 2014. An additional 8 months passed from the time the motion was filed to the time the termination hearing concluded in August 2015. In sum, Max had been in an out-of-home placement for 26 months at the time the termination hearing concluded. As such, there is no dispute that Max was in an out-of-home placement for 15 or more months of the most recent 22 months as § 43-292(7)

requires. Accordingly, there is clear and convincing evidence that termination of Dennis' parental rights in regard to Max was warranted based on § 43-292(7).

### (b) Statutory Basis for Termination as to Donovan

In regard to Donovan, the State alleged and the juvenile court found, that grounds for terminating Dennis' parental rights to Donovan existed under § 43-292(2). As previously set forth, subsection (2) requires a showing that sufficient evidence exists that the parent has substantially and continuously or repeatedly neglected and refused to give the minor child necessary parental care and protection. We agree with the juvenile court that there was sufficient evidence to support termination under § 43-292(2).

Donovan was born in April 2014, and Dennis essentially disappeared for many months prior to and following Donovan's birth. From December 2013 to October 2014, Dennis claimed to have been living and working in Oklahoma. However, he never informed Yost of his move and she had nothing to verify his out of state status. He never gave her an address, proof of residence, or a pay stub from an employer. During this period of time, Dennis was under court order to engage in UA testing, supervised visits, therapeutic visitation, individual therapy, pretreatment assessment, and chemical dependency evaluation. Yost testified that Dennis was only minimally complying with the case plan, specifically noting that he was not doing UA testing and was not having visits with Max or Donovan. Yost testified that there were no reunification efforts by Dennis between December 2013 and October 2014. She testified that she tried to contact Dennis by phone during this time, with limited success. When Dennis returned to Nebraska in October 2014, he started participating in services and was doing so at the time of trial. However, this was only after Donovan was removed from Mary's home in September 2014 and placed in foster care. There was also evidence that Dennis did not come forth to assert himself as Donovan's father until Donovan was removed from Mary's care.

At the time the motion to terminate was filed on December 1, 2014, Dennis had minimal contact with Donovan from the time he was born. He failed to provide Donovan with necessary parental care and protection and showed no interest in being Donovan's father for the first 5 or 6 months of Donovan's life. It was not until Donovan was removed from Mary's care that Dennis began to show any interest in parenting Donovan. We conclude that there was clear and convincing evidence that Donovan came within the meaning of § 43-292(2) in regard to Dennis.

### (c) Best Interests of Max and Donovan

We next consider whether there is sufficient evidence to prove by clear and convincing evidence that it is in Max's and Donovan's best interests that Dennis' parental rights be terminated.

At the time of trial, Dennis was living with his ex-wife. Yost testified that although she considered his housing situation to be safe, she had concerns about the permanency of this arrangement because Dennis and his ex-wife have a history of separating and getting back together.

Dennis has a history of domestic violence, some of which Max had witnessed. Charity also testified that Dennis had punched her on one occasion and had threatened to kill Max. Despite the history of domestic violence, Dennis has not completed any domestic violence classes and Yost was unaware if he had completed any anger management classes.

Dennis has been offered numerous services starting when Max was removed in May 2013, and his participation has been inconsistent. He participated in services between May 2013 and December 2013, but then moved out of state and stopped complying with services. When Dennis returned to Nebraska in October 2014, after being gone for 10 months, he started participating in services again and was doing so at the time of trial. However, Yost was asked what would need to happen for Dennis to be reunited with Max and she replied that she was unsure because numerous services had been offered and an extensive amount of family therapy had taken place with Max and Dennis. She stated that she did not know at that point what services could be offered to make their relationship better.

Yost opined that terminating Dennis' parental rights to Max and Donovan was in their best interests. She based her opinion on the trauma to the children associated with the removals and the neglect they have experienced, the history of involvement by the State, and the history of domestic violence. She also noted that Max has been removed from his home twice and has spent a significant amount of his life in foster care. Yost also stated that Dennis demonstrates a lack of understanding as to why his children are in out-of-home placement and continually blames Mary for their removal.

Beltz and Schwisow testified that about three months before trial Max started regressing from the progress he had made, which was the same time that the number of weekly visits with Dennis increased. Schwisow testified that Max started keeping his feelings to himself and refusing to talk about how he was feeling.

Schwisow also testified about promises Dennis made to Max that he was not able to keep. In November 2014, Dennis told Max he was going to have him and Donovan stay overnight with him during the Thanksgiving holiday. However, Dennis was not having overnight visits and was still under supervised visits. Dennis also told Max on the day of a court hearing that he would get to come live with him that night.

Beltz testified that in her opinion Dennis' parental rights to Max should be terminated because he is not able to provide him with a safe and consistent environment for him to be able to grow and flourish. Beltz also testified that Max needs stability even more than most children because he has been removed from the home more than once. The uncertainty of what will happen next scares him and causes anxiety.

Despite the numerous services offered to Dennis over two years' time, he is still not in a position to parent Max and Donovan. Max's progress has regressed since the number of visits with Dennis have increased. Dennis makes promises to Max that are unrealistic. Yost testified that she does not know what services can be offered that could lead to reunifying Max and Donovan with Dennis. Further, Dennis' participation in services after he returned to Nebraska in October 2014 does not make up for the 10 months that he put forth no reunification efforts or his inconsistent participation in services before then. His willingness to participate in services came about only after Donovan was removed from Mary's home and the motion for termination was filed. When a parent is unwilling or unable to rehabilitate herself within a reasonable period of time, the best interests of the child require termination of parental rights. *In re Interest of B.B.*, 239 Neb. 952, 479 N.W.2d 787 (1992).

Max and Donovan deserve permanency and a stable environment to grow and thrive, which Dennis cannot provide. We conclude that the State presented sufficient evidence for the juvenile court to find that terminating Dennis' parental rights was in Max's and Donovan's best interests.

### 3. Curtis' Parental Rights to Charity

#### (a) Statutory Basis for Termination

The juvenile court found that statutory grounds existed to terminate Curtis' parental rights to Charity based on § 43-292(1), (2), (7), and (9). We conclude that the State presented clear and convincing evidence to prove that termination of Curtis' parental rights was warranted pursuant to § 43-292(7). Charity was removed from Mary's home on May 23, 2013 and she has been in an out-of-home placement since that time. The State filed its motion to terminate Curtis' parental rights on December 1, 2014, approximately 18 months after Charity was removed. An additional 8 months passed from the time the motion was filed to the time the termination hearing concluded in August 2015. Thus, Charity had been in an out-of-home placement for 26 months at the time the termination hearing concluded and the requirements of § 43-292(7) are met.

Since § 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights, we need not specifically address whether the State also met its burden under § 43-292(1), (2), (9).

#### (b) Best Interests of Charity

Having found that at least one statutory ground for termination has been met, we now address whether termination of Curtis' parental rights was in Charity's best interests.

The evidence showed that at the time of trial, Curtis was living in a nursing home as a result of a brain injury he sustained in a work-related accident while using a nail gun. He subsequently suffered a stroke, leaving him with physical and cognitive limitations. Cynthia Hamblen, Curtis' social worker at the nursing home, testified that Curtis was admitted to the nursing home in January 2013 and was subsequently moved to the long-term care area. Hamblen testified that Curtis generally uses a wheelchair, that his left side is paralyzed, and that he requires 24-hour care. However, she also testified that he is an alert individual and is able to communicate clearly with others.

Yost, testified that since she became the case worker in December 2013 she has made attempts every month to speak with or meet with Curtis, but he refuses. Curtis told Hamblen that he did not want to meet or speak with Yost. Yost has provided Curtis with her contact information, but he has never contacted her.

Yost testified that Curtis was present at a meeting held at the end of 2014 where services for Curtis were identified and discussed. The services included therapeutic visitation or family therapy between him and Charity. Curtis indicated he wanted to see Charity. However, Yost has not talked to Curtis since that meeting.

Yost testified that after the motion to terminate was filed in December 2014, she continued to try to contact Curtis on a monthly basis and has talked to his attorney several times about her lack of contact with Curtis and the need to meet with him, but Curtis continued to indicate he did

not want to talk to her. She testified that she has also asked Hamblen and a nurse at the nursing home to talk to Curtis about the importance of communicating with her.

Schwisow testified that from the time Charity was placed with her in May 2013 until trial, Curtis has not tried to make contact with Charity and he has not sent any birthday cards or gifts to Charity. Charity also testified that she has not received any cards, presents or phone calls from him.

There was no evidence that Curtis and Charity had a bond or a significant relationship prior to Curtis' injuries. Yost testified that Curtis' contact with Charity between 2006 and April 2013 was "periodic." The evidence showed that Curtis served a period of time in federal prison for drug related charges and was released in April 2007. Schwisow testified that after Curtis was released from prison she supervised three visits between Charity and Curtis. She testified that prior to these few visits, Charity had no relationship with Curtis and had only met Curtis once before. Charity testified that she last saw Curtis when she was 5 years' old.

Dawn Coffee, a case worker from July 2007 to August 2008 during the first time Charity was removed from Mary's home, testified that the case filed in April 2006 was filed in regard to Mary and Curtis. The amended petition filed in April 2006 alleged that Curtis was incarcerated at that time. Coffee testified that during her time as the case worker, Curtis was on probation. She testified that services were put in place for Curtis in 2007, and such services included visitation. The record is unclear as to how often visits were to occur and whether the visits actually occurred.

Kathleen Opitz, who supervised Charity and Max's case worker from April 2010 until April 2011 during the second time Charity was removed and the first time Max was removed, testified that Curtis chose not to have any contact with the case worker during that time and did not return phone calls. She noted that nothing had been filed against Curtis at that time. She also testified that Curtis was not having visits with Charity during this time and did not want to see her. In March 2011, the court ordered that there would be no visits between Curtis and Charity until Curtis presented himself to the court, at which time the court would require a therapist evaluation of Charity to determine how best to proceed with contact with Curtis

Yost testified that terminating Curtis' rights was in Charity's best interests due to his physical disabilities, the significant amount of time that there has been no contact between Curtis and Charity, and Charity's claim that Curtis sexually abused her. Yost later testified that the allegations made by Charity against Curtis were considered unfounded.

Curtis has been virtually absent for the majority of Charity's life. The number of contacts between Curtis and Charity are negligible and there is no evidence of a bond or relationship. Although Curtis is in a nursing home for long-term care, he has been given the opportunity to connect with his daughter and has demonstrated that he has no desire to do so. Even before his injury, his contacts with Charity have been minimal, as a result of his incarceration and his unwillingness to cooperate with the case workers. We conclude that it is in Charity's best interests to terminate Curtis' parental rights.

## VI. CONCLUSION

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant the termination of Mary's parental rights to Charity, Max, and Donovan; Dennis'

parental rights to Max and Donovan; and Curtis' parental rights to Charity. As such, we affirm the order of the juvenile court terminating Mary's, Dennis', and Curtis' parental rights to the minor children.

AFFIRMED.